# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 29, 2011

No. 09-30503

Lyle W. Cayce
Clerk

CHRISTOPHER S. CALLAHAN

Plaintiff - Appellant

v.

GULF LOGISTICS, L.L.C.; DIAMOND OFFSHORE DRILLING, INC.;
DIAMOND OFFSHORE SERVICES CO.;
DIAMOND OFFSHORE MANAGEMENT CO.;
LLOG EXPLORATION COMPANY, L.L.C.;
LLOG EXPLORATION OFFSHORE, INC.;
GULF LOGISTICS OPERATING, INC.;
DIAMOND OFFSHORE CO.;
LLOG EXPLORATION & PRODUCTION CO.;
LLOG EXPLORATION TEXAS, L.P.,

Defendants - Appellees

Consolidated with
No. 10-30019

CHRISTOPHER S. CALLAHAN,

Plaintiff - Appellant

v.

EAGLE CONSULTING, L.L.C.,

Defendant - Appellee

No.  09-30503
No. 10-30019

———————————

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 6:06-CV-561

———————————

Before JONES, Chief Judge, and HIGGINBOTHAM and SOUTHWICK, Circuit
Judges.

EDITH H. JONES, Chief Judge:[*]

Christopher Callahan ("Callahan") sustained injuries while preparing for
a personnel basket transfer between a crew boat and a mobile drilling unit
located in the Gulf of Mexico.  Callahan filed suit against a number of entities
related to the drilling operations, alleging claims under § 905(b) of the Longshore
and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq*.  The
district court granted summary judgment in favor of defendants, finding that
they acted reasonably as a matter of law.  Callahan timely appealed.  We reverse
and remand for further proceedings against Gulf Logistics but affirm summary
judgment for the other defendants.

## I.  Background

Callahan was employed as a field service technician by Cooper Cameron
Corporation ("Cooper Cameron"), a service provider involved in the installation,
repair, and replacement of equipment on offshore oil wells.  On April 10, 2005,
Callahan was dispatched to a well site located in the Gulf of Mexico to install
wellhead equipment.  Callahan was instructed to board the *MS. NANCY*, a crew
boat, and depart for the *Ocean Spartan*, a mobile drilling unit that was
conducting workover and completion operations at the well.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

2

No. 09-30503
No. 10-30019

Around midnight, the *MS. NANCY* arrived at the *Ocean Spartan*. A deckhand woke Callahan, who had been sleeping during the voyage, and told him, "we're here, we're ready to off-load." In response, Callahan placed his bags on the rear deck outside the door, but continued to wait inside the passenger compartment. Callahan later asked the deckhand whether they were ready for him, to which the deckhand responded "no", and indicated that they would first offload equipment from the boat to the *Ocean Spartan* before transferring Callahan. Callahan continued to wait inside the passenger cabin watching the equipment transfer. During this time, Callahan observed that the sea conditions were rough, with waves reaching heights of fifteen to eighteen feet in his estimation. At some point during the equipment transfer, Callahan concluded that he would be transferred shortly and thus left the cabin in order to move his bag closer to where he believed the personnel basket transfer would take place. When he attempted to lift his bag, however, the vessel lunged and Callahan heard his back pop and felt a sharp pain shoot through it. Callahan dropped his bag and grabbed the wall outside the cabin door to keep himself from falling. Callahan returned to his cabin inside, but eventually executed a successful personnel basket transfer to the *Ocean Spartan*. Callahan reported his injury to a medic once he arrived on the barge.

On March 31, 2006, Callahan filed suit against a number of entities, alleging claims under the LHWCA. The defendants included LLOG Exploration Offshore, Inc. ("LLOG"),[1] which owned and operated the well, and was the time charterer of the *MS. NANCY*[2]; Gulf Logistics, LLC, the operator of the crew boat

---

[1] The district court granted summary judgment in favor of related entities LLOG Exploration Company, LLC; LLOG Exploration & Production Co.; and LLOG Exploration Texas LP, a holding Callahan does not challenge on appeal.

[2] In order to transport personnel and equipment from shore to the drilling barge, LLOG executed a time charter agreement with C&G Boats, Inc., which had a sub-charter with

3

No. 09-30503
No. 10-30019

(*MS. NANCY*); and Diamond Offshore Drilling, Inc., Diamond Offshore Services Co., and Diamond Offshore Management Co., the owners and operators of the *Ocean Spartan*. He later added related defendants Diamond Offshore Co. (collectively "Diamond") and Gulf Logistics Operations, Inc. (collectively "Gulf Logistics"), as well as Eagle Consulting, LLC ("Eagle Consulting"), which LLOG had hired to oversee drilling operations and to provide "company man" services.

Against these parties Callahan asserted various claims of negligence based on the decision to transfer him in unreasonably dangerous conditions. In response, Gulf Logistics and Diamond moved for summary judgment, arguing that they owed no duty to Callahan under *Scindia Steam Navigation Co. v. De los Santos*, 451 U.S. 156, 101 S. Ct. 1614 (1981). The district court rejected this standard and instead applied the reasonable care standard articulated in *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S. Ct. 406 (1959).[3] Nevertheless, the district court granted summary judgment in favor of Diamond and Gulf Logistics, holding as a matter of law that these entities acted reasonably under the circumstances. According to the district court, since no one directed Callahan to leave his cabin, these entities could not be held liable. The district court also noted that:

> Mr. Callahan has made "thousands" of personnel basket transfers in the course of his career. Mr. Callahan's employer, Cooper Cameron, has a "stop work" policy that permits employees to cease working if they find the conditions to be unsafe. Mr. Callahan has used this policy before, and he was neither fired nor demoted for

---

Gulf Logistics, operator of *MS. NANCY*. For this reason, C&G Boats and Gulf Logistics are interchangeable in this context.

[3] In the district court, the parties disagreed as to the standard of care applicable in this case. The district court ultimately concluded that Gulf Logistics and Diamond were subject to the "reasonable care under the circumstances" standard articulated in *Kermarec*. Since the parties do not challenge this ruling on appeal, we assume, without deciding, that *Kermarec*'s standard governs this case.

No. 09-30503
No. 10-30019

> doing so. Mr. Callahan never discussed with anyone whether it was safe to execute a personnel basket transfer, and that he himself believed it was "safe enough" to execute such a transfer. Following his injury, he completed a successful personnel basket transfer.

*Callahan v. Gulf Logistics, LLC*, No. 2:06 CV 0561, slip op. at 7 (W.D. La. Mar. 31, 2009) (citations omitted). For the same reasons, the district court concluded that summary judgment was appropriate on Callahan's claims against LLOG, which had moved for summary judgment on the theory that, as a time charterer of the *MS. NANCY*, it had transferred all control over personnel transfers to the vessel master. The district court did not reach this issue, but reasoned that even if LLOG owed a duty to Callahan, the decision to transfer him was not unreasonable. Thus, the court concluded, there was no breach.

After the district court granted summary judgment in favor of Gulf Logistics, Diamond, and LLOG, Eagle Consulting moved for summary judgment, similarly arguing that there was no negligence in the decision to transfer Callahan and, alternatively, that Eagle Consulting had no involvement in the transfer decision. The district court granted the motion, finding that Callahan failed to demonstrate that Eagle Consulting was responsible, in whole or in part, for his injuries.

On appeal, Callahan argues that the district court erred in finding that the conduct of Diamond, Gulf Logistics, and LLOG was reasonable as a matter of law. With respect to Eagle Consulting, Callahan argues that his proffered evidence established a genuine issue of fact regarding Eagle Consulting's control over the events in question. Thus, he argues, Eagle Consulting was not entitled to summary judgment.

After reviewing the record, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

No.  09-30503
No. 10-30019

## II.  Standard of Review

This is an appeal of the district court's summary judgment in favor of the owners, operators, and charterers of a crew boat and mobile drilling unit.  We review the district court's grant of summary judgment *de novo*.  *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material  fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  In reviewing summary judgment, "[w]e construe all facts and inferences in the light most favorable to the nonmoving party . . ."  *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (citation and internal quotation marks omitted).

## III.  Discussion

To prevail on his maritime tort claim against the appellees, Callahan was required to prove duty, breach, causation, and damages.  *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000); 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MAR. LAW § 5-2, at 252 (5th ed. 2011); *see also Withhart v. Otto Candies, LLC*, 431 F.3d 840, 842 (5th Cir. 2005) ("The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law.").  The relevant evidence regarding each defendant will be treated in turn.

### A.    LLOG Exploration Offshore, Inc.

The district court granted LLOG's motion for summary judgment for lack of evidence of negligent conduct.  While Callahan challenges this ruling on appeal, we affirm the summary judgment on an alternate basis that was presented to but not decided by the district court.  Callahan sued LLOG in its capacity as a time charterer, and was accordingly required to prove, *inter alia*, that LLOG owed him a legal duty of care.  *See Hodgen v. Forest Oil Corp.*,

87 F.3d 1512, 1520 (5th Cir. 1996) *superseded on other grounds by* the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2), *as recognized in Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (en banc). Since Callahan has failed to offer evidence creating a material factual dispute on this issue, LLOG's motion for summary judgment was appropriately granted.

As has been noted, LLOG owned and operated the offshore well to which Callahan was transferred. To facilitate operations at the well, LLOG entered into a blanket time charter agreement with C&G Boats, which furnished the crew boat *MS. NANCY* to LLOG pursuant to a master time charter agreement between C&G Boats and Gulf Logistics. Callahan argues that LLOG "had authority to decide *when* he was transferred" and thus owed him a legal duty of care.

From our decision in *Hodgen*, 87 F.3d at 1520, the operative principles are clear. A time charterer owes a hybrid duty arising from contract and tort to persons including vessel passengers, to avoid negligent activity within "the sphere of activity over which it exercises at least partial control." *Id*. Those traditional spheres of activity include, *inter alia*, choosing the vessel's general mission and the specific time in which it will perform the mission. *Id*. The vessel owner and time charterer may, however, by contract vary the traditional assignment of control. *Id*. Finally, absent special circumstances, a time charterer's traditional sphere of control does not extend to providing a safe means of ingress and egress from the vessel. *Id*. (citing *Moore v. Phillips Petrol Co.*, 912 F.2d 789 (5th Cir. 1990); *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213 (5th Cir. 1993)). Applied in this case, the *Hodgen* principles compel summary judgment for LLOG based on its charter agreement with C&G Boats and the absence of any evidence that LLOG created "special circumstances" by involving itself in the timing or means of Callahan's transfer.

7

No. 09-30503
No. 10-30019

Both parties rely on the charter agreement between LLOG and C&G Boats to support their respective positions. Callahan asserts that the agreement "gave the vessel owner the authority to choose *how* to operate the crew boat," but that "LLOG Offshore retained the authority to choose *where* and *when*." LLOG, in contrast, contends that the charter agreement allowed LLOG to "categorically relinquish[]" whatever traditional responsibility it may have had over the vessel. The resolution of this issue turns on the relevant portion of the charter agreement:

> [T]he entire operation, navigation, management, control, performance, and use of each vessel shall be under the sole and exclusive command of, and be actually accomplished by, [C&G Boats] as an independent contractor, [LLOG] being interested only in the results obtained. [LLOG] shall, however, have the right to designate the voyages to be undertaken and the services each vessel is to perform, subject always to the sole right of [C&G Boats] or the captain of each vessel to determine whether the movement may be safely undertaken, with the captain always being in charge.

Callahan asserts that LLOG's right "to designate the voyages to be undertaken" included a right to control the *timing* of operations. As a result, LLOG owed Callahan a duty to make this decision reasonably. This argument, however, is contradicted by the plain meaning of the above paragraph, the first sentence of which removes from LLOG any control over the means by which its desired results were obtained. LLOG maintained an interest in the "results obtained," but the timing of Callahan's transfer to the *Ocean Spartan* falls squarely in the realm of means, over which LLOG disavowed all control. In fact, LLOG ratified the vessel captain's exclusive right to determine the safety of a voyage. That LLOG reserved a "right to designate the voyages to be undertaken," refers, in context, only to its designation of the general mission of the vessel but not to operational matters such as the *timing* of personnel transfers.

8

No. 09-30503
No. 10-30019

Not only did LLOG contractually disclaim its right to override the vessel captain's safety decisions, but Callahan adduced no evidence that LLOG's conduct as a charterer was more broadly exercised or inconsistent with the terms of the charter agreement. Unlike *Hodgen*, there is no evidence that LLOG interfered with or involved itself at all in the timing or means of Callahan's transfer.[4]

## B.    Gulf Logistics Entities

Callahan alleged that Gulf Logistics, the vessel operator/owner, acted negligently when it was decided to transfer him from the *MS. NANCY* to the *Ocean Spartan* in unreasonably dangerous conditions.

In general, the question whether an alleged tortfeasor exercised reasonable care under the circumstances is appropriately left for the jury to decide. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 482 (5th Cir. 2006) (citation omitted); *Randolph v. Laeisz*, 896 F.2d 964, 971 (5th Cir. 1990). In this case, however, the district court concluded that, as a matter of law, Gulf Logistics did not breach its duty of reasonable care. The court relied on evidence that no one directed Callahan to leave his cabin; that Callahan himself "did not believe the seas were too dangerous for work or to make the personnel basket transfer"; and that he in fact "safely completed a personnel basket transfer after his injury." Moreover, the court reasoned that since wave

---

[4] Callahan also implies that this court should not affirm on the issue of control, because LLOG failed to offer evidence of its absence of control before summary judgment was granted. When LLOG moved for summary judgment, it informed the court that "there is no evidence to demonstrate that LLOG Offshore retained or exercised any control over the dispatching of the M/V MS. NANCY or the transfer of plaintiff from the M/V MS. NANCY and to the OCEAN SPARTAN." LLOG bore no burden to prove the absence of control. After LLOG identified the absence of evidence, the burden shifted to Callahan to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (internal quotation marks and citations omitted). Callahan failed to carry his burden.

9

height alone could not alone establish Gulf Logistics' liability, there was no issue of material fact for the jury to decide.

As an initial matter, there is considerable dispute over what evidence this court may consider in reviewing the district court's summary judgment ruling. The district court's ruling as to Gulf Logistics was handed down on March 31, 2009. Accordingly, we do not consider the affidavits of Callahan's proffered expert witness John Manders or Callahan's supplemental affidavit dated June 15, 2009. *See Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) ("[o]ur review is confined to an examination of materials before the lower court at the time the ruling was made ; subsequent materials are irrelevant."). The parties also dispute whether we may consider Callahan's affidavit dated October 30, 2008. Gulf Logistics contends it should be disregarded. It is correct that a "nonmoving party cannot defeat a summary judgment motion by attempting to create a disputed material fact through the introduction of an affidavit that directly conflicts with his prior deposition testimony," *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 233 n.9 (5th Cir. 1984). Nevertheless, a subsequent affidavit that supplements or explains, rather than contradicts, prior deposition testimony does not offend this rule. *See Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988); *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980). Callahan's subsequent affidavit does not in all respects clearly contradict his deposition testimony. We will consider the affidavit's relevant portions only to the extent that they supplement Callahan's deposition testimony.

Gulf Logistics asserts that the district court's decision is supported by ample evidence confirming the court's reasoning. Gulf Logistics does not deny that it owed Callahan a duty of reasonable care. The only question before us,

then, is whether there is sufficient evidence to create a genuine fact issue that this duty was breached.

Gulf Logistics first argues that no one directed Callahan to go onto the back deck and move his equipment. His action alone harmed him, and it was unilateral and voluntary. Appellee relies upon Callahan's deposition testimony:

Q: Did anybody instruct you to go out onto the back deck of the boat and you did so?
A: No, sir.
Q: That was your choice?
A: Yes, sir.

The district court accepted this testimony as conclusive against Gulf Logistics' negligence.

A more complete rendition of Callahan's deposition supports the following: when the boat arrived at the rig, the deckhand awakened Callahan and said, "we're here, we're ready to off-load." Callahan testified that nobody instructed him to go out onto the back deck, but he also stated that he believed he "was obligated to do [the transfer]." Callahan's subsequent affidavit clarified that even though "nothing more was said" after the deckhand indicated they had arrived, "nothing more needed to be said," since Callahan understood the deckhand to mean "that it was time for [him] to get ready for a personnel basket transfer from the crew boat." Callahan then used the restroom and placed his bags on the back deck, right outside the door. Callahan asked the deckhand whether they were ready for him, to which the deckhand responded "no, they're going to off-load the equipment, then they're going to come get you." Callahan watched the process from inside his cabin and independently gauged that the crew would be ready for him shortly. Callahan explained that from his experiences with personnel basket transfers, he knew that he needed to "be prepared and ready" to reach the basket "as quickly as possible" to load his bags

11

and mount the basket.[5]  With this understanding, Callahan left the cabin in order to move his bags closer to the place where he would enter the basket.  It was at this time, when Callahan attempted to move his bags, that his injury occurred.

While the district court correctly noted that no one directed Callahan to leave the cabin of the ship, this does not necessarily absolve Gulf Logistics of liability.  Callahan's affidavit suggests that custom and experience surrounding basket transfers involves certain expectations to which he conformed his conduct by moving his bags and preparing for the transfer.  A jury could disbelieve this explanation if it credited instead Callahan's admission that according to his employer's "stop work" policy, he could refuse to make a personnel basket transfer and had done so in the past without adverse consequences.  Alternatively, a reasonable jury could find that Gulf Logistics implicitly directed him to prepare for a transfer, and he was required to prepare his bags and position himself appropriately on the deck.

Next, Gulf Logistics defends the district court's summary judgment on the basis that because Callahan himself did not believe it was unsafe to make a personnel basket transfer.  The principal evidence cited for this proposition is the following portion of Callahan's deposition testimony:

> Q: [D]id you think you could safely perform the personnel basket transfer in the conditions that you saw?
> A: Yes, sir.  I felt I was obligated to do it, so yes, I felt it was safe enough to do it.
> Q: Okay.  Now, you eventually made  that personnel basket transfer safely, correct?
> A: Yes, sir.

---

[5] In fact, at his deposition, Callahan testified that nobody from Gulf Logistics gave him any instructions on how he was supposed to make the personnel basket transfer, which means the transfer was executed without much communication. This arguably lends support to Callahan's subsequent assertion regarding expectations of the industry.

No.  09-30503
No. 10-30019

First, Callahan's subjective belief concerning the safety of a personnel basket transfer may be probative, but it is not dispositive of whether Gulf Logistics breached its duty of care by setting up the transfer.  The measure of danger in the situation is an objective, not subjective, question.

Second, the record is not as simple as Gulf Logistics asserts.   Elsewhere in his deposition testimony, Callahan testified that, at the time of the transfer, he considered the conditions "real rough," "bad," and "unsafe" to "be working in." The accident report includes that Callahan reported to the medic that, at the time of his injury, the seas had been "very rough."   Taken together, this testimony at the very least creates a fact issue regarding Callahan's beliefs concerning the conditions of the sea and the impact of the conditions on the reasonableness of a decision to transfer.

Finally, Gulf Logistics contends that because Callahan was ultimately able to complete the personnel basket transfer without further incident, the decision to transfer him could not have been unreasonable.  But the relevant events in determining breach are not limited solely to the moment of transfer, and necessarily include the events immediately leading up to it as well.  Callahan's movement toward the personnel basket was part of the single transfer event. That Callahan was injured only at an earlier step in the process provides scant support, much less support as a matter of law, for the claim that the decision to transfer him was reasonable.

Callahan's deposition testimony and the accident report furnish some evidence that the conditions in which the transfer was made were hazardous. The accident report from April 11, 2005, contains Callahan's statements that the seas were "very rough" at the time of his injury.  Callahan repeatedly testified that he believed the waves reached heights of fifteen to eighteen feet and that,

13

under such conditions, the seas were unsafe to be working in.[6] While the district court correctly noted that Callahan's testimony regarding wave height does not conclusively establish Gulf Logistics' liability at this stage, it is not irrelevant to the reasonableness of the transfer decision.[7] Callahan's evidence is thin but sufficient to create a fact issue as to breach.[8]  The district court thus erred in granting summary judgment to Gulf Logistics.

## C.    Diamond Offshore Entities.

Diamond was the owner and operator of the *Ocean Spartan*, the mobile drilling unit to which Callahan was ultimately transferred.  The district court granted summary judgment in favor of Diamond largely for the reasons given in resolving Gulf Logistics' motion for summary judgment.  Diamond's principal argument in the district court was that it had no duty to Callahan under *Scindia.* Diamond has, however, abandoned that contention on appeal.  Instead, Diamond now argues that it never directed Callahan at any stage of the transfer,

---

[6]  Callahan testified as follows:
Q.    Okay.  When did you come to the conclusion that the seas were unsafe?
A.    When I woke up, awoken.
Q.    And how did you come to that conclusion?
A.    We were being – when I looked outside and saw on the lake how rough the seas were.
Q.    And what conclusion did you come to then?
A.    It was 15-foot seas.
Q.    Did you consider 15-foot seas to be unsafe?
A.    Yes.
Q.    You considered 15-foot seas to be unsafe to do what?
A.    To be working in.

[7] There is conflicting evidence in the record as to the height of the waves.  Callahan testified that the waves reached heights of fifteen and eighteen feet.  The accident report, on the other hand, stated that the waves were at ten feet.  Callahan explained that this discrepancy arose when the medic who helped create the accident report concluded that the waves were ten feet.  Callahan objected to this conclusion, but was allegedly told not to "worry about it," since ten feet was "close enough."

[8] We of course do not opine on issues not before us such as comparative negligence.

and, alternatively, that Callahan failed to demonstrate that Diamond had a duty to control the operation of a vessel it neither owned, operated, nor chartered. Callahan responds that this court should not address these arguments, but instead remand, since Diamond did not raise them in the district court.

Without doubt, the focus of Diamond's motion for summary judgment was on the *Scindia* standard, but Diamond made a number of factual arguments that implicitly challenged the issues Callahan raises on appeal.  In the district court, Diamond underscored the absence of evidence showing any communication between Diamond and Callahan during the transfer.  Moreover, Diamond argued that Callahan alone made the decision to walk onto the rear deck; that none of Diamond's equipment was in the vicinity when his injury occurred; that Diamond had no duty to prevent Callahan from entering the rear deck before the personnel basket was lowered; and that Diamond never assumed a supervisory role over the operations.  These fact-based arguments asserted that Diamond played no role in directing Callahan to leave the cabin of the *MS. NANCY* for the deck.  In fact, in response to Diamond's motion for summary judgment, Callahan argued that the *Ocean Spartan* was a "full and essential partner[] to the decision to direct and carry out the personnel basket transfer."  Callahan thus understood Diamond's argument to include a challenge to the element of control.

In this court,  Diamond contends that it neither  exercised control over the operations of the *MS. NANCY* nor directed Callahan to prepare for the transfer, and thus cannot be liable for breach.  This argument was "implicit . . . in the issues or evidence tendered below," *FDIC v. Laguarta*, 939 F.2d 1231, 1240 (5th Cir. 1991).  As Callahan had notice that Diamond denied any control over his action, and he had nearly three years to develop the record before summary judgment was granted, we will consider Diamond's newly focused argument. *See FDIC v. Lee*, 130 F.3d 1139, 1142 (5th Cir. 1997) (noting that the court need not

15

follow the general rule counseling against our considering new grounds on appeal "if the circumstances warrant to the contrary").

A review of the relevant evidence demonstrates that the district court appropriately granted Diamond summary judgment.  Callahan testified that from the time he boarded the boat until his injury, he never spoke to anybody but the deckhand.  He admitted that no one from Diamond told him how or when to make the personnel basket transfer.  Although Gulf Logistics arguably directed Callahan to prepare for disembarking, Callahan provides no competent evidence that Diamond issued a similar directive–either explicit or implied.  Nothing in the record shows that Diamond directed Callahan either to position himself on the rear deck or to prepare for the transfer, or that Diamond had any control over the transfer or the decision to initiate it.  Callahan simply lumped Diamond in with the rest of the defendants, without specifying the nature of Diamond's role in causing his injury.

Callahan's brief acknowledges as much with a noticeable dearth of citations supporting its most salient assertions.  For example, Callahan's brief baldly asserts that no transfer decision "could occur without Diamond's concurrence," but it cites no evidence for this claim.  Moreover, the oblique reference in Callahan's subsequent affidavit to "drilling rig personnel" indicating that he should transfer is conjectural, conclusory, and belied by Callahan's prior testimony that his only contact on the ship was with the deckhand.  Since Callahan has failed to present any competent evidence of Diamond's role in the transfer, summary judgment was appropriately granted in favor of Diamond.

## D.    Eagle Consulting, L.L.C.

Finally, Callahan appeals the grant of summary judgment in favor of Eagle Consulting.  The district court found that Callahan failed to demonstrate that Eagle Consulting was responsible, in whole or in part, for Callahan's

injuries.    On appeal, Callahan challenges this ruling, arguing that Eagle Consulting exercised sufficient operational control over the events in question that it may be liable for any negligence in the transfer decision.[9]

Eagle Consulting contracted with LLOG to provide "company man" services for the operations at LLOG's offshore well.  In accordance with their agreement, Eagle Consulting supplied LLOG with two company men, including Dale Munger, whose job duties included "day-to-day supervision" of the drilling operations.  Munger, who was aboard the *Ocean Spartan* when Callahan was injured, had ordered the services of Cooper Cameron to assist in installing a new wellhead.  Cooper Cameron sent Callahan in response.  The question is whether Eagle Consulting exercised sufficient control over these events that it may be liable for any negligence in the process of Callahan's transfer.

Callahan relies on an affidavit from John Manders, a marine operations and safety expert, to explain the relationship between "company men" and contracting parties like LLOG.  Manders's affidavit stated that the role of LLOG's "company man" was "to represent the interests of LLOG throughout the program of well drilling and testing activities being conducted by the jack-up drilling rig *Ocean Spartan*."  Further, the company man "had overall operational control of both the *Ocean Spartan* and the crewboat *MS. NANCY* and all related activities on the lease," and was responsible for insuring "that those operations subject to his control were conducted . . . free from recognized hazards."[10]

---

[9] Since Eagle Consulting moved for summary judgment after the district court granted summary judgment in favor of the other defendants, the competent summary judgment record relating to Eagle Consulting includes evidence subsequently offered on behalf of Callahan. We thus consider evidence against Eagle that was properly not considered against the other appellees.

[10] Manders claims that Munger was "the man with the most authority over the operation."

No.  09-30503
No. 10-30019

According to Manders's affidavit, one particular duty of the company man was to arrange for the transportation of LLOG's contract workers to and from the field, which allegedly included "the authority to direct the crew boat MS. NANCY . . . as to the time the MS. NANCY's passenger was to be transferred." While the time charter agreement allocated this control to Gulf Logistics, Manders's affidavit suggests LLOG's company man may have exercised control in fact.  *Cf. Hodgen*, 87 F.3d at 1520 (stating that a time charterer may be liable "if the plaintiff can establish that [an] accident resulted in part from a decision, such as the timing of the ingress or egress, within the time charterer's control spheres").

We assume *arguendo* that Eagle Consulting's scope of services for LLOG in connection with the well's operation could include services pertaining to the separate time charter agreement between LLOG and Gulf Logistics.  After reviewing the record, however, we find that any control wielded by Munger was purely theoretical and insufficient to create a fact issue concerning breach of duty by Eagle Consulting.  Munger testified that, as a company man, he "[p]rovided day-to-day supervision over the drilling or workover project"), and he was the "head man on [the] job."  Further, he had "STOP work authority" to terminate operations he deemed unsafe.  He also explained that he did not have a vantage point to observe crew boat operations, because people on the rig were seventy-five feet above the water.  In fact, Munger testified that he did not recall looking at the seas around the time Callahan was injured, nor having any conversations with the crane operator, the crew boat, or anyone from LLOG or Eagle after ordering Cooper Cameron's services.

There is, in sum, no evidence that Munger exercised actual control over the decision to transfer Callahan.  Instead, it was Munger's practice to leave the determination of whether conditions were too rough for a personnel basket

18

transfer to the "discretion of the crane operator and the boat captain"–and there is no evidence that he had ever overridden their decisions.[11]  The record thus suggests that even though Munger could theoretically terminate conduct he believed unsafe, this alone is insufficient to create a material fact issue as to Eagle Consulting's liability for the actual  decision to transfer Callahan.  There is simply no evidence that Munger was in fact aware of the sea conditions or involved in the decision to transfer him.  Eagle Consulting was entitled to summary judgment.

## IV.  Conclusion

For these reasons, we AFFIRM the summary judgments in favor of the LLOG entities, the Diamond entities, and Eagle Consulting, but REVERSE and REMAND as to the Gulf Logistics entities for proceedings consistent herewith.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

---

[11] Munger stated: "I defer the operation of the boat to the boat captain, always have. . . ."  He also said that he could not "override a captain on his boat": "If he doesn't want to run the boat we can't tell him to."  While he would "probably have [the] right" to say no if a captain wanted to run his boat in dangerous seas, he admitted that he had "never exercised that right."