PER CURIAM: **
Daniel Valderaz filed suit under Title VII of the Civil Rights Act of 1964 alleging that his employer, University Medical Center (UMC), operated by Lubbock County Hospital District, retaliated against him in response to a charge of sex-based harassment he reported to his supervisors. The district court entered summary judgment in favor of UMC, and Valderaz now appeals. For the reasons stated herein, we affirm.
FACTS AND PROCEDURAL HISTORY
Valderaz was first employed by UMC .in June 2009 as a Registered Nurse in the Surgical Intensive Care/Burn Unit (SICU). He transferred to the Pediatric Intensive Care Unit (PICU) around November 2010. The PICU consisted of two male nurses (including Valderaz) and seven female nurses.
From November 2010 to March 2011, Valderaz says female nurses harassed him with offensive remarks that were sometimes sexual in nature. He claims that his coworkers made frequent jokes about him having a homosexual relationship with Fausto Montes, a male charge nurse in PICU. For example, female coworkers would make remarks to Valderaz, a married heterosexual, such as: “Where’s your boyfriend, Fausto?” and “Your man, Faus-to, just texted me.” Valderaz claims that even doctors and residents joined in on the charade at times. He criticized them for antagonizing him and asked them to stop, but it only increased the frequency of their behavior. In addition, some female coworkers regularly made remarks of his inability to be a good pediatric nurse because he is a man. In particular, they said that “he could not provide as good of care to patients of the hospital as the female nurses” because he “didn’t have the nurturing capabilities of a woman.”
On March 2, 2011, Valderaz reported the conduct to Nancy Leal, Director of PICU. Leal addressed Valderaz’s coworkers and told them to stop their inappropriate behavior. Valderaz claims that the mistreatment towards him decreased, but it did not stop. In response to Leal’s directive, Val-deraz contends that his coworkers began ■ retaliating against.him by giving him little to no assistance with patient care, which made it difficult for him to perform his duties effectively.
Around March 7, 2011, Leal told Valder-az that his coworkers filed reports against him for inadequate job performance. Without giving him the opportunity to defend against the reports, Leal required Valderaz to undergo additional training. Valderaz asserts that the imposition of additional training itself was an act of retaliation. He did not attend the training, how *819 ever, because it conflicted with certain events in his personal life: the death of his wife’s grandmother, the death of his wife’s mother, and his receipt of a court subpoena for a criminal trial.
On April 11, 2011, Valderaz met with Leal, Kanice Newton (UMC’s Director of Human Resources), and others — including his wife — to discuss his coworkers’ hostile behavior towards him. In this meeting, Valderaz alleges that he expressed how he needed measures taken to relieve the tension in the work environment caused by his coworkers, because it limited his ability to effectively care for his patients. In response, Newton suggested that he transfer to another department. According to Valderaz, he was told to find a department with an opening for a nurse and UMC would make an exception for him to transfer into it.[1] He claims Newton specifically stated, “We will find you a place to go, that this is an exception, and we will transfer you.”[2] He says he was directed to the recruiting department to seek an open position. Because he believed that a position would be available for him in another department, he agreed to transfer.
UMC disputes Valderaz’s account of what took place in that meeting. Leal asserts that Valderaz initially expressed a desire to be transferred into another department. She informed Valderaz that “another position was not guaranteed and that he would have to interview for positions and receive an offer ... from department supervisors.” She also avers that Valderaz “was not promised that a position would be available for transfer during the meeting or at any other time....”[3] After the April 11 meeting, Brenda Thomas, UMC’s nurse recruiter, stated that she too discussed UMC’s transfer process with Valderaz and explained to him that she “could not place him in a position and ... it was up to him to secure an offer from a department head.”
After the meeting, in search of a new position, Valderaz reported to the nurse recruiting office. He was told that a position was not guaranteed and that he had to compete with other nurses. Valderaz claims he was told that he was terminated on April 11, 2011, but UMC says no one ever told him he was terminated; he was merely classified as “on-call” in the PICU, presumably while he searched for another position. Valderaz claims he never knew about the “on-call” position until after being told that he was terminated a second time.
The record is clear that Valderaz was not terminated as an employee on April 11. It was not until April 25, in fact, that UMC formally altered his employment status to “on-call.” UMC also allowed Valderaz to retain full-time benefits until April 80, at which point full-time benefits would end if he did not obtain another position.
Valderaz applied for two positions, a nursing position in the cath lab and a nursing position in the operating room, on April 18, 2011. He did not apply for any other positions after this date (even though there were others available which paid more than what he was making in the PICU). Valderaz was removed from payroll and officially terminated on June 24, 2011. The reason for his termination, ac *820 cording to Newton, was because “Valderaz was unable to find another position and had not worked the requisite number of on-call shifts to remain on the payroll” as required by UMC’s employment policy.
Eventually, Valderaz received an interview for a position with the operating room, but he had already accepted other employment. The record does not provide when this interview took place nor does it state the date when Valderaz received employment at another hospital.
On February 6, 2013, Valderaz filed the instant action in the United States District Court for the Northern District of Texas asserting claims of hostile work environment based on sex harassment and retaliation pursuant to Title VII, 42 U.S.C. §§ 2000e, et seq. On June 5, 2013, the district court dismissed Valderaz’s hostile work environment claim. A year later, the court granted UMC’s motion for summary judgment as to the retaliation claim. Val-deraz now timely appeals the latter decision.
STANDARD OF REVIEW
This court reviews the grant of summary judgment de novo, applying the same standard as the district court. Condrey v. SunTrust Bank of Ga., 429 F.3d 556, 562 (5th Cir.2005). “Summary judgment is proper when the evidence, viewed in the light most favorable to the non-movant, reflects no genuine issues of material fact.” Rubinstein v. Administrators of Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir.2000). To defeat summary judgment, the non-movant need only point to the existence of a genuine issue of material fact. Mason v. United Air Lines, Inc., 274 F.3d 314, 316 (5th Cir.2001).
ANALYSIS
In Title VII retaliation cases, the plaintiff must first make the following prima facie showing: “(1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action.” Raggs v. Miss. Power & Light Co., 278 F.3d 463, 471 (5th Cir.2002) (citation omitted). If the plaintiff presents a prima facie case, “the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action.” Aldrup v. Caldera, 274 F.3d 282, 286 (5th Cir.2001) (citation omitted). If the defendant does so, the burden returns to the plaintiff to prove that the employer’s stated reason for the adverse action was merely a pretext for the real, discriminatory purpose. Id. “The plaintiff must prove pretext by the standard of but-for causation.” Roberts v. Lubrizol Corp., 582 Fed.Appx. 455, 460 (5th Cir.2014) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. -, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013)).
I. Prima Facie Case
A. Whether a Valderaz Engaged in Protected Activity
Title VII forbids employment discrimination against any individual based on that individual’s “race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(1) (emphasis added). “When' the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment, Title VII is violated.” Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (citation omitted).
Title VII also protects employees for having “opposed any practice made an unlawful employment practice by this sub- *821 chapter.” 42 U.S.C. § 2000e-3(a). An employee need not prove that the discriminatory practice he reported was actually unlawful; he need only show a reasonable belief that such conduct constituted an unlawful employment practice under Title VIL Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 348 (5th Cir.2007) (citation omitted).
Valderaz engaged in protected activity when he reported sex harassment to his supervisor on March 2, 2011. UMC attempts to confuse the arguments by focusing on whether Valderaz had a claim for sex harassment. But that is not required under this prong. The district court properly concluded that Valderaz made an internal report of perceived discrimination, which is protected by Title VIL See Payne v. McLemore’s Wholesale & Retail Stores, 654 F.2d 1130, 1140 (5th Cir.1981).
B. Whether Valderaz Suffered a Materially Adverse Action
Valderaz points to numerous events he claims constitute materially adverse actions: (1) Leal subjecting him to negative treatment by telling his coworkers he had complained about them; (2) the lack of assistance in caring for patients and false performance reports made by female coworkers; (3) being required to attend trainings as a result of those reports; and (4) his inability to be transferred to another department, which resulted in his termination.
An adverse employment action is one that a reasonable employee would have found ... materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. In determining whether an adverse employment action occurred, we focus on the final decisionmaker. The actions of ordinary employees are not imputable to their employer unless they are conducted in furtherance of the employer’s business. There must, however, be a direct relationship between the allegedly discriminatory conduct and the employer’s business.
Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 657 (5th Cir.2012) (quotation marks and citation omitted). “[P]etty slights, minor annoyances, and simple lack of good manners” are not actionable retaliatory conduct. Stewart v. Miss. Transp. Comm’n, 586 F.3d 321, 332 (5th Cir.2009) (citation omitted).

1. Leal’s meeting with female coworkers

Valderaz claims that after he reported his coworkers’ conduct to Leal, she immediately held a meeting where she told Valderaz’s coworkers about his complaints. He argues that this subjected him to additional negative treatment, which made it more difficult to work at UMC.
“Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiffs position, considering all the circumstances.” Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quotation marks and citation omitted). Based on Valderaz’s allegations, Leal’s attempt to resolve the situation by informing Valderaz’s coworkers of his complaint was not actionable retaliatory conduct. Valderaz has not given the Court any reason to conclude that Leal set that meeting with any intentions other than to address the conflict. While there may be circumstances which would counsel against a supervisor confronting wayward employees about their treatment of a co-employee and disclosing that co-employee’s complaint with specificity, this is not one of them.

*822
2.Lack of assistance and false reports

Next, Valderaz advances that his female coworkers refused to give him proper assistance and lodged false reports against him because he reported their harassing conduct. These incidents do not qualify as materially adverse because they were committed by ordinary employees and were not committed in furtherance of UMC’s business.[4] See Hernandez, 670 F.3d at 657 (citing Long v. Eastfield Coll., 88 F.3d 300, 306 (5th Cir.1996) (holding that employers are not liable for conduct of ordinary employees, because an ordinary employee’s conduct “will normally be so unrelated to the employer’s business that it cannot be deemed ‘in furtherance’ thereof’)).

3.Requirement to attend training

Although not clearly articulated by Valderaz, he relies on the so-called “cat’s paw” theory of liability to establish that he was subject to a materially adverse action when he was forced-to undergo training as a result of false performance reports made by female coworkers. This theory allows the coworkers’ alleged discriminatory animus to be imputed to Leal’s decision to require Valderaz to attend training, if Leal “acted as a rubber stamp, or the cat’s paw, for the [coworkers’] prejudice.” Ameen v. Merck & Co., 226 Fed.Appx. 363, 376-77 (5th Cir.2007) (quotation marks and citations omitted). To invoke the cat’s paw analysis, Valderaz must submit evidence sufficient to establish two conditions: (1) that his coworkers exhibited retaliatory animus, and (2) that they possessed leverage, or exerted influence, over Leal. Id. at 377 (citation omitted).
Valderaz has provided sufficient evidence showing that his coworkers had reason to retaliate once they learned that he complained of their illicit behavior, but he has not put forth evidence that they had any undue influence over Leal. Moreover, on this record, training in and of itself would not dissuade a reasonable employee from making a discrimination claim. Indeed, Valderaz admitted that he did not resent the fact that he was required to go through training.[5]

4.Final Termination

Valderaz next argues that UMC advised him to transfer as a ploy to ultimately terminate his employment. The parties do not dispute that Valderaz’s loss of employment is an adverse employment action, as this Court has always held that it is. See DeHart v. Baker Hughes Oilfield Operations, Inc., 214 Fed.Appx. 437, 442 (5th Cir.2007) (citation omitted).
C. Whether There Was a Causal Link
Valderaz must next show that his termination on June 24, 2011 had a causal nexus to the report he made about his female coworkers on March 2, 2011.
*823 We have often looked to three factors when considering the causal link prong: “(1) the employee’s past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee’s conduct and termination.” Id. at 442-43 (citation omitted). The record here supports only the third prong, which Valderaz employs. While suspicious timing alone is rarely sufficient to establish the requisite causal connection, see id., this Court allows for a prima facie case to be made on temporal proximity alone if it is “very close,” Washburn v. Harvey, 504 F.3d 505, 511 (5th Cir.2007) (citation omitted). For example, a time lapse of up to four months has been found to be sufficient. See Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir.2001); Hypolite v. City of Houst., Tex., 493 Fed.Appx. 597, 606 (5th Cir.2012). But see Flanner v. Chase Inv. Servs. Corp., 600 Fed.Appx. 914, 921-22 (5th Cir.2015) (noting that a four-month gap, or even a two-month gap, standing alone, is insufficient to establish causation, and that Evans actually held that the five-day gap in time was sufficient in that case.)
Here, fewer than four months elapsed between the time that Valderaz reported sex harassment to his supervisor and his termination. Therefore, Valderaz has established his prima facie case for retaliation.
II. Legitimate, nonretaliatory reason for termination
The burden now shifts to UMC to articulate its legitimate, nonretaliatory reason for the adverse action. See Aldrup, 274 F.3d at 286. UMC proffers two legitimate, nondiscriminatory reasons for Valderaz’s termination: that his final termination was due to his lack of diligence in seeking available transfer positions and that he lacked the requisite number of on-call shifts to remain on the payroll. This is sufficient to satisfy its burden of production.
III. Evidence of Pretext
To prove pretext, Valderaz must bring forth “substantial evidence” demonstrating that UMC’s proffered reasons are a pretext for retaliation. Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C., 547 Fed.Appx. 484, 489 (5th Cir.2013) (citation omitted). Valderaz argues that UMC misled him into giving up his full-time position so that it could eventually terminate him. He also asserts that misrepresentations were made to him during the April 11 meeting so that he would agree to a transfer. In short, the April 11 meeting was a ruse in order for him to be terminated, says Valderaz.
The testimony of Valderaz and his wife, standing alone, does not create a triable issue with respect to pretext. See id. at 490. It is his burden “to prove that a retaliatory motive was the but-for cause of, not merely a motivating factor behind, the decision to terminate h[im].” Id. (citing Nassar, 133 S.Ct. at 2533). There is no evidence to support Valderaz’s belief that he was terminated immediately after the April 11 meeting.[6] The evidence shows *824 that UMC relaxed its policy so that Val-deraz could continue to work in PICU as an on-call employee, while seeking open positions in other departments. On these facts, there is nothing other than Valder-az’s subjective belief that UMC retaliated against him. That belief, no matter how genuine, is insufficient to show pretext without further evidence. See Pennington v. Texas Dep’t of Family & Protective Servs., 469 Fed.Appx. 332, 339 (5th Cir.2012) (citation omitted). The record irrefutably shows that he was terminated weeks after having been placed as an on-call status employee.
The record evidence also supports UMC’s reason regarding lack of diligence. UMC’s Director of Human Resources attempted to assist Valderaz in finding another position, but he missed at least one appointment with nursing recruitment that was set up to help him. Although there were other positions available that provided a higher wage, Valderaz applied to only two positions. When he received an interview for one of those positions, he had already taken another job. This record, including Valderaz’s testimony, taken in the light most favorable to Valderaz, does not provide the “substantial evidence” needed to preclude summary judgment on Valderaz’s retaliation claim.
CONCLUSION
For the forgoing reasons, we AFFIRM the district court’s grant of summary judgment on Valderaz’s retaliation claim.

 Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

.Under the employment handbook, UMC’s transfer policy requires three things: that an employee must work one year in a department, an employee must interview with management in the department to which the transfer is requested, and the employee must compete with other applicants.

. Valderaz’s wife submitted an affidavit corroborating his account of the meeting.

. Newton corroborated these statements.

. Valderaz refers to his female coworkers interchangeably as both his "coworkers” and his "supervisors.” His assertion that their title as "charge nurses” makes them supervisors is conclusory. There is no evidence in this record that they were supervisors. See Long v. Eastfield Coll., 88 F.3d 300, 306 (5th Cir.1996) (stating that supervisors have power over employment status). In fact, as mentioned by the district court, this Court has previously found that "charge nurses” are not considered supervisors in labor-relations cases. See Entergy Gulf States, Inc. v. NLRB, 253 F.3d 203, 210 (5th Cir.2001).

. Ironically, because training usually benefits the employee, many employees base their Title VII claims on a denial of training. See, e.g., Earle v. Aramark Corp., 247 Fed.Appx. 519, 523 (5th Cir.2007); Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 354 (5th Cir.2001); Wojciechowski v. Nat’l Oilwell Varco, L.P., 763 F.Supp.2d 832, 856 (S.D.Tex.2011).

. In concluding that there is a genuine fact dispute, the dissent points to Valderaz’s affidavit. That affidavit (along with his wife's affidavit) was executed on April 11, 2014, the same day that plaintiff filed his response to UMC’s motion.for summary judgment. The affidavit contrasts with Valderaz’s deposition testimony. At his deposition, Valderaz acknowledges that his decision not to return to the PICU was not dependent upon any promise that he be transferred to another job with the hospital. Valderaz testified that the rea *824 son he did not go back was because of the perceived hostile work environment. That was his testimony, and his later filed affidavit should not be relied upon to defeat summary judgment. See Callahan v. Gulf Logistics, L.L.C., 456 Fed.Appx. 385, 392 (5th Cir.2011) (citation omitted). The record does not provide a basis for a jury to find but-for causation between Valderaz’s complaints about his coworkers and his termination.