# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 29, 2012

No. 11-50003

Lyle W. Cayce
Clerk

SUSAN PENNINGTON,

Plaintiff-Appellant

v.

THE TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,

Defendant-Appellee

Appeal from the United States District Court for the
Western District of Texas
USDC No. 1:09-cv-00287

Before BENAVIDES, STEWART, and GRAVES, Circuit Judges.

Benavides, Circuit Judge:[*]

Plaintiff-Appellant Susan Pennington ("Pennington") brings suit against the Texas Department of Family and Protective Services ("DFPS"), alleging that she was subject to a hostile work environment, and that she was forced to resign in retaliation for opposing race and sex discrimination, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The district court granted summary judgment in favor of the DFPS on all claims. Pennington now appeals the district court's ruling as to her retaliation claim.

---

[*] Pursuant to FIFTH CIRCUIT RULE 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in FIFTH CIRCUIT RULE 47.5.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pennington was hired as a Division Manager at DFPS on February 26, 2007. Heather Shiels ("Shiels"), the Director of the Residential Contract Unit at DFPS, hired Pennington and was also her immediate supervisor. Shiels, in turn, reported to Jeannie Coale ("Coale"), the Assistant Commissioner of Purchased Client Services. Pennington supervised fifteen residential contract managers located across Texas. As a new hire, Pennington had to serve a 12-month probationary period, during which time DFPS could dismiss her without advance notice or cause.

Soon after Pennington joined the DFPS, in March 2007, Shiels asked her to hire a new residential contract manager for the San Antonio DFPS office. Shiels told Pennington that the San Antonio office had suffered a high turnover and needed stability. Pennington interviewed four candidates for the position, and ranked Donna Rash ("Rash") as the top candidate. Pennington had supervised Rash at another agency, and thought she was the best fit for the job. Rash was pregnant at the time of the interview, which Pennington knew. She also knew that Rash lived in Taylor, Texas, east of Austin, and thus would have a considerable commute to the DFPS office in San Antonio.

On March 28, 2007, Pennington told Shiels that she had chosen Rash for the San Antonio position. From this point forward, the parties tell very different versions of what happened over the next few months. Pennington claims that Shiels said she had heard Rash was pregnant, and angrily confronted Pennington, saying "What are you thinking? A pregnant woman cannot handle the workload, you know what our workload is like. A pregnant woman can't do this job." Pennington says that she responded by praising Rash's experience and competence, noting that she had worked with Rash before and felt she was the best candidate for the job. At this time, Pennington did not make any comments

2

to Shiels about discrimination, because she did not want to anger Shiels further. Shiels claims, however, that she did not know Rash was pregnant, and that she was only concerned about the distance Rash lived from San Antonio. Because she was dissatisfied with Pennington's choice, Shiels called to check the references for the next candidate on the list, but the references were not positive.

Over the next week, Pennington alleges that she discussed hiring Rash several more times with Shiels, and that on at least one occasion, she told Shiels "words to the effect that 'we can't not hire Donna because she's pregnant, it's a civil rights issue,' or 'it's blatant discrimination.'" On April 6, 2007, a week after Pennington had selected Rash as a residential contract manager in San Antonio, Shiels approved the hire.

At the same time that Rash was being interviewed and hired, Shiels voiced concerns with Pennington's job performance, including her failure to complete assignments on-time and to communicate with Shiels regarding the status of assignments. On March 29, 2007, Shiels had a conference with Pennington regarding her job performance and workplace attitude. Then on April 4, 2007, Shiels sent an email to John Adamo ("Adamo"), legal counsel for DFPS, to discuss her concerns about Pennington and inquire about her options for disciplinary action. Shiels and Adamo met on the following day and after their meeting, Shiels began to document Pennington's performance problems. Shiels also requested feedback from another employee regarding Pennington's performance, and the feedback was at times negative.

In late April or early May of 2007, DFPS internally posted a position for an opening in the Austin field office, and Rash asked Pennington if she could apply. As a new hire, DFPS policy required that Rash serve a probationary period of one year, during which time she could not apply and compete for internal open positions unless the new position would result in an increase in

3

pay or the Commissioner approved a waiver of the policy as being in the best interest of the agency. The Austin position would not have meant an increase in pay for Rash, and would have been essentially a lateral transfer. Rash had not framed the request to Pennington as an accommodation for her pregnancy, but simply as desirable because it was closer to her home. Therefore, when Pennington approached Shiels regarding Rash's request, she did not relate the transfer to Rash's pregnancy. Pennington alleges that Shiels responded, "absolutely not," and told Pennington that Rash was her hire and she would "have to pick up [Rash's] slack."

Later in May 2007, Rash again approached Pennington about transferring to the Austin office. This time, Rash said that her obstetrician had recommended that she travel less in her last trimester of pregnancy. Pennington was nervous about approaching Shiels again regarding Rash's request, and she researched the DFPS policies before bringing the matter to Shiels's attention. According to Pennington, Shiels got very angry and allegedly "said words to the effect of 'I told you she couldn't do the job. A pregnant – a pregnant woman can't be a Contract Manager.'" Pennington states that she "knew this was discrimination but . . . did not argue with [Shiels]," and instead "tried to be positive."

Pennington followed up on her conversation with Shiels by sending her an email requesting a management-directed transfer for Rash as a reasonable accommodation for her pregnancy complications. She says that she also provided Shiels with a note from Rash's doctor recommending that Rash reduce her driving and stay close to Austin. Rash testified that she gave the doctor's note to Pennington, but Shiels testified that she did not receive a note until the end of June. DFPS produced a copy of the June note, but neither party produced the note from May.

4

Shiels responded to Pennington in an email dated May 23, 2007, in which she said that Rash could not transfer to Austin until her probationary period was over. Shiels did not mention that Rash was seeking the transfer as a reasonable accommodation, and testifies that the request was not framed as an accommodation for pregnancy-related medical complications and was not accompanied by any medical documentation. Shiels also emphasized the need for the San Antonio office to have stability. Pennington was frustrated by this response, and she met with Shiels again regarding accommodating Rash. Pennington states that she believed Shiels was discriminating against Rash because of her pregnancy, and says that she told Shiels it was a "civil rights issue." Shiels allegedly became angry again, and would not discuss the matter further. Pennington tried to approach Coale about Rash's request for an accommodation, but Coale refused to discuss it.

Pennington states that Shiels increased her scrutiny of both Pennington and Rash after the May request for an accommodation, including accusing Pennington of allowing Rash to work from home and a local office, and requiring Rash to submit an accounting of all of her work hours, assignments, and locations. Pennington testifies that she never allowed Rash to work from home or a local office, while DFPS has produced a document written by another employee stating that she heard that Rash had been working from home or in an Austin-area DFPS office at times.

After doing further research regarding DFPS policies, Pennington located a Reasonable Accommodation Request form online and forwarded it to Rash to fill out. Pennington also discussed the proper procedures for making a request with Orlando Smith ("Smith") in the Health and Human Services Commission ("HHSC") Office of Civil Rights, then added her information and signature to Rash's Reasonable Accommodation Request and forwarded it with a second

5

doctor's note to Shiels on June 29, 2007.  This email appears in the record.  On the same day, Pennington tried to discuss the matter with Coales, as Shiels was out of the office and Pennington feared the request would cause controversy when Shiels returned.  Again, Coale stopped Pennington, told her it was Shiels's decision, and would not discuss the request.

On Thursday, July 5, 2007, Pennington had not received a response from either Shiels or Coale regarding Rash's accommodation request, so she forwarded it to Smith in the Office of Civil Rights.  The following day, Shiels met with Pennington and told her: "I've had enough of you going to my supervisor about me."  Shiels gave Pennington the choice of voluntarily resigning or being terminated.  Shiels said she would put in writing that Pennington was resigning "for the good of the unit," and agreed to pay her for all of her accrued compensatory time if she voluntarily resigned.  Pennington chose to resign, and remained a DFPS employee through August 1, 2007.  Shiels testified that she did not know that Pennington had submitted the Reasonable Accommodation Request to the Office of Civil Rights until after her resignation.

In addition to alleging that DFPS retaliated against her for opposing pregnancy discrimination against Rash, Pennington alleges that the retaliation was in response to her opposition to race discrimination.  In early June 2007, Pennington came across a budget spreadsheet that she felt showed that African-American employees in the division made significantly less money that non-minority employees.  She asked the team lead and another employee if there were legitimate reasons they were paid less, such as length of employment or job performance.  Shortly after speaking with them, Pennington alleges that Shiels came into her office "in a rage," slammed the door, knocked things off her desk, and yelled "words to the effect of 'what are you doing and why are you asking questions about these employees?'"  Pennington testifies that she replied that

the spreadsheet seemed to show compensation discrimination, and that "Ms. Shiels shouted or screamed words to the effect that they . . . were lazy and acceptant of their salaries and if they wanted more, they could apply for a job somewhere else." Shiels denied being hostile, and testified that she was not upset that Pennington was complaining about inequitable compensation, but because she was sharing salary information with peers, which Shiels felt was inappropriate.

Pennington filed suit against HHSC and DFPS on April 15, 2009. Her claims against HHSC were dismissed without prejudice and Pennington filed an amended complaint against DFPS, alleging that DFPS subjected her to a hostile work environment and terminated her in retaliation for her opposition to discrimination, in violation of Title VII. DFPS filed a motion for summary judgment, and on November 23, 2010, the district court granted the motion. The court found that Pennington had failed to make out a prima facie case of retaliation, and that even if she had made out a prima facie case, she had failed to show that DFPS's proffered reason for its action was pretext. The district court also held that Pennington had failed to present evidence sufficient to establish that she was subjected to a hostile work environment. Pennington timely appealed, challenging only the district court's grant of summary judgment on her retaliation claim.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo* and apply the same standard as the district court. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010). Under that standard, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, we construe all the evidence and

reasonable inferences in the light most favorable to the nonmoving party. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 234 (5th Cir. 2010) (quoting *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009)).

### III. ANALYSIS

When a plaintiff alleges retaliation in violation of Title VII, a court applies the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *LeMaire v. La. Dept. of Transp. and Dev.*, 480 F.3d 383, 388 (5th Cir. 2007); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000). Under that framework, the plaintiff must first make out a prima facie case of retaliation, which requires showing that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between her activity and the employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007). Once the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse employment action. *Id.* at 557. If the employer meets this burden of production, then the burden shifts back to the plaintiff to show that the employer's proffered explanation is a pretext for retaliation. *Byers*, 209 F.3d at 427. At this stage, "a plaintiff must show that the adverse employment action would not have occurred 'but for' the protected activity in order to prove unlawful retaliation." *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996) (citation omitted).

Here, Pennington argues that she presented sufficient evidence to establish both a prima facie case of retaliation, and to raise a material issue of fact as to whether DFPS's proffered reasons for her constructive discharge were a pretext for discrimination. DFPS responds that the district court properly

granted summary judgment because Pennington failed to show that she engaged in protected activity, or that a causal nexus exists between any alleged protected activity and her discharge. Furthermore, DFPS agrees with the district court that Pennington failed to demonstrate that its reasons for constructively discharging her were pretextual.

As previously stated, the district court found that Pennington had failed to make out a prima facie case of retaliation, but went on to hold that even if she had successfully presented a prima facie case, she did not show that DFPS's proffered reasons for her constructive discharge were pretext for retaliation. Since our disposition on pretext is determinative on appeal, we express no opinions with respect to the district court's findings as to Pennington's prima facie case.

The district court held that "Pennington has made no showing that she would not have been constructively discharged but for her assisting Rash in filing her accommodation request or her opposition to discriminatory practices." The court found that Pennington's subjective belief that she was asked to resign in retaliation for her opposition to discrimination was insufficient to survive summary judgment. The court also found that Pennington admitted that she often felt overwhelmed by the amount of work she was expected to perform, and that she had trouble meeting deadlines set by Shiels, such that she "concede[d] she could not meet her supervisor's performance expectations." Finally, the district court held that Pennington had offered no additional evidence beyond the temporal proximity between her protected activity and her constructive discharge to support a finding of pretext, such that her claim could not survive summary judgment.

At the pretext stage, "the only question . . . is whether the evidence of retaliation, in its totality, supports an inference of retaliation." *Shackelford v.*

*Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999). As stated earlier, the plaintiff must show that the employer's adverse action would not have occurred "but for" her protected activities. *Evans v. City of Hous.*, 246 F.3d 344, 354 (5th Cir. 2001); *Shackelford*, 190 F.3d at 409; *Long*, 88 F.3d at 308. One way a plaintiff shows but-for causation is by providing "[p]roof that the defendant's explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully [retaliated]." *Id.* at 148; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

We agree with the district court that Pennington has produced insufficient evidence to show pretext, and to therefore permit an inference of retaliation. As the district court found, Pennington admitted that she often had difficulty meeting deadlines set by Shiels, and that she at times felt overwhelmed. While Pennington also testified that she felt that she performed "[e]xtremely well" in her position, Pennington's personal belief regarding her job performance is insufficient to raise a fact issue regarding DFPS's proffered reasons for its action. *See Mire v. Texas Plumbing Supply Co., Inc.*, 286 F. App'x 138, 144 (5th Cir. 2008) (per curiam).

As part of its justification for constructively discharging Pennington, DFPS presented multiple examples of Pennington's performance deficiencies during her employment, including: Pennington mishandled the processing of a contract and the enactment of a contract suspension on April 3, 2007, and May 31, 2001; Pennington failed to notify staff of a conference call; Pennington failed to timely send out a contract to committee members; Pennington failed to notify staff of a conference call; on multiple occasions, Pennington did not adequately review

10

contracts before forwarding them to Shiels; on July 3, 2007, Pennington instigated a confrontation between two contract managers under her supervision; and, Pennington attempted to discuss work-related issues with Coale, rather than going to Shiels first.  Pennington fails to deny the majority of these deficiencies, instead providing excuses.  For instance, on April 9, 2007, Shiels ordered Pennington to send out a draft contract to committee members before Pennington left town, which Pennington agreed to do.  Pennington admits that she did not send out the contract, but says that she did so because members of the committee requested more time to review the contract.  Similarly, Pennington admits that she may have sent contracts to Shiels with errors in them, but she states that, "[g]iven the large number of contracts, emergency or rush situations, the number of staff involved and the nature of the process, it was simply an unavoidable possibility that Shiels caught an occasional error." The only DFPS allegation that Pennington denies is that she failed to inform staff members of the planned conference call; otherwise, she offers no evidence to dispute DFPS's criticisms of her job performance.

In her attempt to show pretext, Pennington relies on temporal proximity and Shiels's comments to Pennington when Pennington was forced to resign. Pennington points out that DFPS terminated her three days after she sent a copy of Rash's formal reasonable accommodation request to Shiels, and that her termination also occurred close in time to other protected activity in which she engaged.  This Court has held, however, that timing alone cannot establish pretext, once an employer has furnished a legitimate, nonretaliatory reason for its actions.  *See Hernandez v. Yellow Transp., Inc.,* 670 F.3d 644*, ___* (5th Cir. 2012); *Roberson v. Alltel Infor. Serv.*, 373 F.3d 647, 656 (5th Cir. 2004). According to Pennington, Shiels's alleged statement, "I've had enough of you going to my supervisor about me," serves as further evidence of pretext.

11

Pennington sought to speak with Coale two times, and on both occasions she attempted to discuss Rash's request for an accommodation. Thus, Pennington alleges that despite DFPS's assertion that her various missteps on the job were the reasons for her constructive discharge, the only reason allegedly given by Shiels at the time of the discharge was an action related to Pennington's protected activity. However, Shiels's statement is consistent with previous warnings she gave Pennington to bring problems she had with the unit directly to Shiels, instead of going over Shiels's head to Coale. It is also consistent with DFPS's proffered reasons for constructively discharging Pennington. Rather than provide "[p]roof that the defendant's explanation is unworthy of credence," Shiels's statement bolsters DFPS's defense. *Reeves*, 530 U.S. at 147. We therefore find that Pennington has failed to offer "other significant evidence of pretext." *Shackelford*, 190 F.3d at 409.

Likewise, Pennington has failed to overcome her burden of showing pretext, and has failed to show that her opposition to race discrimination was the real reason for her constructive discharge. She voiced her concerns regarding minority employee pay differentials in June 2007, and was constructively discharged the following month. Beyond temporal proximity, she has produced no evidence that suggests that her opposition to race discrimination was the "but-for" cause for her constructive discharge. "Temporal proximity, standing alone, is not enough" to create a material issue of fact regarding the reason for DFPS's adverse employment action. *Hernandez*, 670 F.3d at ___.

"[T]he ultimate issue on summary judgment is whether [Pennington] produced evidence which could support a finding that she would not have been fired in the absence of her having engaged in protected conduct." *Shackelford*, 190 F.3d at 409. Pennington's subjective belief that she was the victim of

retaliation, even if that belief is genuine, is insufficient to carry her case without further evidence of pretext. *Sherrod v. Sears, Roebuck & Co.*, 785 F.2d 1312, 1316 (5th Cir. 1986); *Elliott v. Group Medical & Surgical Service*, 714 F.2d 556, 567 (5th Cir. 1983). Furthermore, it is not this Court's place to determine whether DFPS's expectations of Pennington were reasonable, and we will not "second-guess the business decisions of an employer, so long as those decisions are not the result of discrimination." *Jackson v. Watkins*, 619 F.3d 463, 468 n.5 (5th Cir. 2010) (per curiam). Accordingly, summary judgment in favor of DFPS was appropriate.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

Carl E. Stewart, Circuit Judge, concurs in the judgment only.