# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10761

United States Court of Appeals
Fifth Circuit

**FILED**

June 24, 2015

Lyle W. Cayce
Clerk

DANIEL VALDERAZ,

Plaintiff - Appellant

v.

LUBBOCK COUNTY HOSPITAL DISTRICT D/B/A UNIVERSITY
MEDICAL CENTER,

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:13-CV-023

Before JOLLY and DENNIS, Circuit Judges, and REEVES*, District Judge.

PER CURIAM:**

Daniel Valderaz filed suit under Title VII of the Civil Rights Act of
1964 alleging that his employer, University Medical Center (UMC), operated
by Lubbock County Hospital District, retaliated against him in response to a
charge of sex-based harassment he reported to his supervisors. The district

---

* District Judge of the Southern District of Mississippi, sitting by designation.
** Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should
not be published and is not precedent except under the limited circumstances set forth in
5th Cir. R. 47.5.4.

No. 14-10761

court entered summary judgment in favor of UMC, and Valderaz now appeals. For the reasons stated herein, we affirm.

## FACTS AND PROCEDURAL HISTORY

Valderaz was first employed by UMC in June 2009 as a Registered Nurse in the Surgical Intensive Care/Burn Unit (SICU). He transferred to the Pediatric Intensive Care Unit (PICU) around November 2010. The PICU consisted of two male nurses (including Valderaz) and seven female nurses.

From November 2010 to March 2011, Valderaz says female nurses harassed him with offensive remarks that were sometimes sexual in nature. He claims that his coworkers made frequent jokes about him having a homosexual relationship with Fausto Montes, a male charge nurse in PICU. For example, female coworkers would make remarks to Valderaz, a married heterosexual, such as: "Where's your boyfriend, Fausto?" and "Your man, Fausto, just texted me." Valderaz claims that even doctors and residents joined in on the charade at times. He criticized them for antagonizing him and asked them to stop, but it only increased the frequency of their behavior. In addition, some female coworkers regularly made remarks of his inability to be a good pediatric nurse because he is a man. In particular, they said that "he could not provide as good of care to patients of the hospital as the female nurses" because he "didn't have the nurturing capabilities of a woman."

On March 2, 2011, Valderaz reported the conduct to Nancy Leal, Director of PICU. Leal addressed Valderaz's coworkers and told them to stop their inappropriate behavior. Valderaz claims that the mistreatment towards him decreased, but it did not stop. In response to Leal's directive, Valderez contends that his coworkers began retaliating against him by giving him little to no assistance with patient care, which made it difficult for him to perform his duties effectively.

2

No. 14-10761

Around March 7, 2011, Leal told Valderaz that his coworkers filed reports against him for inadequate job performance. Without giving him the opportunity to defend against the reports, Leal required Valderaz to undergo additional training. Valderaz asserts that the imposition of additional training itself was an act of retaliation. He did not attend the training, however, because it conflicted with certain events in his personal life: the death of his wife's grandmother, the death of his wife's mother, and his receipt of a court subpoena for a criminal trial.

On April 11, 2011, Valderaz met with Leal, Kanice Newton (UMC's Director of Human Resources), and others—including his wife—to discuss his coworkers' hostile behavior towards him. In this meeting, Valderaz alleges that he expressed how he needed measures taken to relieve the tension in the work environment caused by his coworkers, because it limited his ability to effectively care for his patients. In response, Newton suggested that he transfer to another department. According to Valderaz, he was told to find a department with an opening for a nurse and UMC would make an exception for him to transfer into it.[1] He claims Newton specifically stated, "We will find you a place to go, that this is an exception, and we will transfer you."[2] He says he was directed to the recruiting department to seek an open position. Because he believed that a position would be available for him in another department, he agreed to transfer.

UMC disputes Valderaz's account of what took place in that meeting. Leal asserts that Valderaz initially expressed a desire to be transferred into another department. She informed Valderaz that "another position was not

---

[1] Under the employment handbook, UMC's transfer policy requires three things: that an employee must work one year in a department, an employee must interview with management in the department to which the transfer is requested, and the employee must compete with other applicants.

[2] Valderaz's wife submitted an affidavit corroborating his account of the meeting.

3

guaranteed and that he would have to interview for positions and receive an offer . . . from department supervisors." She also avers that Valderaz "was not promised that a position would be available for transfer during the meeting or at any other time . . . ."[3] After the April 11 meeting, Brenda Thomas, UMC's nurse recruiter, stated that she too discussed UMC's transfer process with Valderaz and explained to him that she "could not place him in a position and . . . it was up to him to secure an offer from a department head."

After the meeting, in search of a new position, Valderaz reported to the nurse recruiting office. He was told that a position was not guaranteed and that he had to compete with other nurses. Valderaz claims he was told that he was terminated on April 11, 2011, but UMC says no one ever told him he was terminated; he was merely classified as "on-call" in the PICU, presumably while he searched for another position. Valderaz claims he never knew about the "on-call" position until after being told that he was terminated a second time.

The record is clear that Valderaz was not terminated as an employee on April 11. It was not until April 25, in fact, that UMC formally altered his employment status to "on-call." UMC also allowed Valderaz to retain full-time benefits until April 30, at which point full-time benefits would end if he did not obtain another position.

Valderaz applied for two positions, a nursing position in the cath lab and a nursing position in the operating room, on April 13, 2011. He did not apply for any other positions after this date (even though there were others available which paid more than what he was making in the PICU). Valderaz was removed from payroll and officially terminated on June 24, 2011. The reason for his termination, according to Newton, was because "Valderaz was

---

[3] Newton corroborated these statements.

No. 14-10761

unable to find another position and had not worked the requisite number of on-call shifts to remain on the payroll" as required by UMC's employment policy.

Eventually, Valderaz received an interview for a position with the operating room, but he had already accepted other employment. The record does not provide when this interview took place nor does it state the date when Valderaz received employment at another hospital.

On February 6, 2013, Valderaz filed the instant action in the United States District Court for the Northern District of Texas asserting claims of hostile work environment based on sex harassment and retaliation pursuant to Title VII, 42 U.S.C. §§ 2000e, *et seq*. On June 5, 2013, the district court dismissed Valderaz's hostile work environment claim. A year later, the court granted UMC's motion for summary judgment as to the retaliation claim. Valderaz now timely appeals the latter decision.

**STANDARD OF REVIEW**

This court reviews the grant of summary judgment *de novo*, applying the same standard as the district court. *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 562 (5th Cir. 2005). "Summary judgment is proper when the evidence, viewed in the light most favorable to the non-movant, reflects no genuine issues of material fact." *Rubinstein v. Administrators of Tulane Educ. Fund*, 218 F.3d 392, 399 (5th Cir. 2000). To defeat summary judgment, the non-movant need only point to the existence of a genuine issue of material fact. *Mason v. United Air Lines, Inc.*, 274 F.3d 314, 316 (5th Cir. 2001).

**ANALYSIS**

In Title VII retaliation cases, the plaintiff must first make the following prima facie showing: "(1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a

5

causal link existed between the protected activity and the adverse action." *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002) (citation omitted). If the plaintiff presents a prima facie case, "the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action." *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001) (citation omitted). If the defendant does so, the burden returns to the plaintiff to prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose. *Id.* "The plaintiff must prove pretext by the standard of but-for causation." *Roberts v. Lubrizol Corp.*, 582 F. App'x 455, 460 (5th Cir. 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —— U.S. ——, 133 S. Ct. 2517, 2533 (2013)).

## I.  Prima Facie Case

### A. Whether Valderaz Engaged in Protected Activity

Title VII forbids employment discrimination against any individual based on that individual's "race, color, religion, *sex*, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (citation omitted).

Title VII also protects employees for having "opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). An employee need not prove that the discriminatory practice he reported was actually unlawful; he need only show a reasonable belief that such conduct constituted an unlawful employment practice under Title VII. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (citation omitted).

No. 14-10761

Valderaz engaged in protected activity when he reported sex harassment to his supervisor on March 2, 2011. UMC attempts to confuse the arguments by focusing on whether Valderaz had a claim for sex harassment. But that is not required under this prong. The district court properly concluded that Valderaz made an internal report of *perceived discrimination*, which is protected by Title VII. *See Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981).

**B. Whether Valderaz Suffered a Materially Adverse Action**

Valderaz points to numerous events he claims constitute materially adverse actions: (1) Leal subjecting him to negative treatment by telling his coworkers he had complained about them; (2) the lack of assistance in caring for patients and false performance reports made by female coworkers; (3) being required to attend trainings as a result of those reports; and (4) his inability to be transferred to another department, which resulted in his termination.

> An adverse employment action is one that a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. In determining whether an adverse employment action occurred, we focus on the final decisionmaker. The actions of ordinary employees are not imputable to their employer unless they are conducted in furtherance of the employer's business. There must, however, be a direct relationship between the allegedly discriminatory conduct and the employer's business.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012) (quotation marks and citation omitted). "[P]etty slights, minor annoyances, and simple lack of good manners" are not actionable retaliatory conduct. *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) (citation omitted).

No. 14-10761

### *1. Leal's meeting with female coworkers*

Valderaz claims that after he reported his coworkers' conduct to Leal, she immediately held a meeting where she told Valderaz's coworkers about his complaints. He argues that this subjected him to additional negative treatment, which made it more difficult to work at UMC.

"Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 71 (2006) (quotation marks and citation omitted). Based on Valderaz's allegations, Leal's attempt to resolve the situation by informing Valderaz's coworkers of his complaint was not actionable retaliatory conduct. Valderaz has not given the Court any reason to conclude that Leal set that meeting with any intentions other than to address the conflict. While there may be circumstances which would counsel against a supervisor confronting wayward employees about their treatment of a co-employee and disclosing that co-employee's complaint with specificity, this is not one of them.

### *2. Lack of assistance and false reports*

Next, Valderaz advances that his female coworkers refused to give him proper assistance and lodged false reports against him because he reported their harassing conduct. These incidents do not qualify as materially adverse because they were committed by ordinary employees and were not committed in furtherance of UMC's business.[4] *See Hernandez,* 670 F.3d at 657 (citing

---

[4] Valderaz refers to his female coworkers interchangeably as both his "coworkers" and his "supervisors." His assertion that their title as "charge nurses" makes them supervisors is conclusory. There is no evidence in this record that they were supervisors. *See Long v. Eastfield Coll.*, 88 F.3d 300, 306 (5th Cir. 1996) (stating that supervisors have power over employment status). In fact, as mentioned by the district court, this Court has

8

No. 14-10761

*Long v. Eastfield Coll.*, 88 F.3d 300, 306 (5th Cir. 1996) (holding that employers are not liable for conduct of ordinary employees, because an ordinary employee's conduct "will normally be so unrelated to the employer's business that it cannot be deemed 'in furtherance' thereof")).

### 3. Requirement to attend training

Although not clearly articulated by Valderaz, he relies on the so-called "cat's paw" theory of liability to establish that he was subject to a materially adverse action when he was forced to undergo training as a result of false performance reports made by female coworkers. This theory allows the coworkers' alleged discriminatory animus to be imputed to Leal's decision to require Valderaz to attend training, if Leal "acted as a rubber stamp, or the cat's paw, for the [coworkers'] prejudice." *Ameen v. Merck & Co.*, 226 F. App'x 363, 376-77 (5th Cir. 2007) (quotation marks and citations omitted). To invoke the cat's paw analysis, Valderaz must submit evidence sufficient to establish two conditions: (1) that his coworkers exhibited retaliatory animus, and (2) that they possessed leverage, or exerted influence, over Leal. *Id.* at 377 (citation omitted).

Valderaz has provided sufficient evidence showing that his coworkers had reason to retaliate once they learned that he complained of their illicit behavior, but he has not put forth evidence that they had any undue influence over Leal. Moreover, on this record, training in and of itself would not dissuade a reasonable employee from making a discrimination claim. Indeed, Valdarez admitted that he did not resent the fact that he was required to go through training.[5]

---

previously found that "charge nurses" are not considered supervisors in labor-relations cases. *See Entergy Gulf States, Inc. v. NLRB,* 253 F.3d 203, 210 (5th Cir. 2001).

[5] Ironically, because training usually benefits the employee, many employees base their Title VII claims on a denial of training. *See, e.g., Earle v. Aramark Corp.*, 247 F. App'x

No. 14-10761

#### *4. Final Termination*

Valderaz next argues that UMC advised him to transfer as a ploy to ultimately terminate his employment. The parties do not dispute that Valderaz's loss of employment is an adverse employment action, as this Court has always held that it is. *See DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (citation omitted).

### C. Whether There Was a Causal Link

Valderaz must next show that his termination on June 24, 2011 had a causal nexus to the report he made about his female coworkers on March 2, 2011.

We have often looked to three factors when considering the causal link prong: "(1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee's conduct and termination." *Id.* at 442-43 (citation omitted). The record here supports only the third prong, which Valderaz employs. While suspicious timing alone is rarely sufficient to establish the requisite causal connection, *see id.*, this Court allows for a prima facie case to be made on temporal proximity alone if it is "very close," *Washburn v. Harvey*, 504 F.3d 505, 511 (5th Cir. 2007) (citation omitted). For example, a time lapse of up to four months has been found to be sufficient. *See Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)); *Hypolite v. City of Houst., Tex.*, 493 F. App'x 597, 606 (5th Cir. 2012). *But see Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 921-22 (5th Cir. 2015) (noting that a four-month gap, or even a two-month gap, standing alone, is insufficient to establish causation, and that *Evans* actually held that the five-day gap in time was sufficient in that case.)

---

519, 523 (5th Cir. 2007); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 354 (5th Cir. 2001); *Wojciechowski v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832, 856 (S.D. Tex. 2011).

No. 14-10761

Here, fewer than four months elapsed between the time that Valderaz reported sex harassment to his supervisor and his termination. Therefore, Valderaz has established his prima facie case for retaliation.

## II. Legitimate, nonretaliatory reason for termination

The burden now shifts to UMC to articulate its legitimate, nonretaliatory reason for the adverse action. *See Aldrup*, 274 F.3d at 286. UMC proffers two legitimate, nondiscriminatory reasons for Valderaz's termination: that his final termination was due to his lack of diligence in seeking available transfer positions and that he lacked the requisite number of on-call shifts to remain on the payroll. This is sufficient to satisfy its burden of production.

## III. Evidence of Pretext

To prove pretext, Valderaz must bring forth "substantial evidence" demonstrating that UMC's proffered reasons are a pretext for retaliation. *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 547 F. App'x 484, 489 (5th Cir. 2013) (citation omitted). Valderaz argues that UMC misled him into giving up his full-time position so that it could eventually terminate him. He also asserts that misrepresentations were made to him during the April 11 meeting so that he would agree to a transfer. In short, the April 11 meeting was a ruse in order for him to be terminated, says Valderaz.

The testimony of Valderaz and his wife, standing alone, does not create a triable issue with respect to pretext. *See id.* at 490. It is his burden "to prove that a retaliatory motive was the but-for cause of, not merely a motivating factor behind, the decision to terminate h[im]." *Id.* (citing *Nassar*, 133 S. Ct. at 2533). There is no evidence to support Valdarez's belief that he

was terminated immediately after the April 11 meeting.[6] The evidence shows that UMC relaxed its policy so that Valderaz could continue to work in PICU as an on-call employee, while seeking open positions in other departments. On these facts, there is nothing other than Valderaz's subjective belief that UMC retaliated against him. That belief, no matter how genuine, is insufficient to show pretext without further evidence. *See Pennington v. Texas Dep't of Family & Protective Servs.*, 469 F. App'x 332, 339 (5th Cir. 2012) (citation omitted). The record irrefutably shows that he was terminated weeks after having been placed as an on-call status employee.

The record evidence also supports UMC's reason regarding lack of diligence. UMC's Director of Human Resources attempted to assist Valderaz in finding another position, but he missed at least one appointment with nursing recruitment that was set up to help him. Although there were other positions available that provided a higher wage, Valderaz applied to only two positions. When he received an interview for one of those positions, he had already taken another job. This record, including Valderaz's testimony, taken in the light most favorable to Valderaz, does not provide the "substantial evidence" needed to preclude summary judgment on Valderaz's retaliation claim.

---

[6] In concluding that there is a genuine fact dispute, the dissent points to Valderaz's affidavit. That affidavit (along with his wife's affidavit) was executed on April 11, 2014, the same day that plaintiff filed his response to UMC's motion for summary judgment. The affidavit contrasts with Valderaz's deposition testimony. At his deposition, Valderaz acknowledges that his decision not to return to the PICU was *not* dependent upon any promise that he be transferred to another job with the hospital. Valderaz testified that the reason he did not go back was because of the perceived hostile work environment. That was his testimony, and his later filed affidavit should not be relied upon to defeat summary judgment. *See Callahan v. Gulf Logistics, L.L.C.*, 456 F. App'x 385, 392 (5th Cir. 2011) (citation omitted). The record does not provide a basis for a jury to find but-for causation between Valderaz's complaints about his co-workers and his termination.

No. 14-10761

## CONCLUSION

For the forgoing reasons, we **AFFIRM** the district court's grant of summary judgment on Valderaz's retaliation claim.

No. 14-10761

JAMES L. DENNIS, Circuit Judge, dissenting:

Because the majority affirms summary judgment for the defendant in this case by erroneously construing some of the plaintiff's evidence against him and by expressly disregarding other of his evidence, I respectfully dissent.

## I.

Daniel Valderaz, a former hospital nurse, claims that his female coworkers made a number of remarks to him that were sexual in nature. He also says that they questioned his ability, as a man, to work as a pediatric nurse and refused to cooperate in performing nursing services with him. Believing these comments and actions to be sex discrimination that was detrimental to his job performance and the safety of his patients, he reported their conduct to hospital supervisors. On April 11, 2011, Valderaz met with the hospital's HR director, Kanice Newton, to discuss his discrimination complaint. Also present at the meeting were several other hospital representatives, and Valderaz's wife came with him. This is what Valderaz attests, in his affidavit, happened at the meeting (there is also an affidavit in the record from Valderaz's wife corroborating the account):

> Ms. Newton, instead of stating that she would take steps to correct the problems I was having, instead, suggested that I transfer out of PICU [the Pediatric Intensive Care Unit] into another department. In doing so, she explicitly and clearly told me that there were nursing positions available for me to transfer out of the department and that all I needed to do was to choose one and I would be transferred to that department. I was specifically told by Ms. Newton that I was transferring, not that I was resigning and applying for a job in another department. In fact, she stated that she was making an exception for me to do that. I agreed to the transfer based upon the specific

14

statements made by Ms. Newton, the Human Resources Director, that it was, in fact, a transfer. I told her that I could not afford to lose my job because of a number of reasons and she assured me that I was not losing my job but was simply making a transfer to an existing position. I did not misunderstand what the Human Resources Director told me, and I relied upon her representations in agreeing to transfer. She then told me to report to the recruiting office to begin the transfer process. When I arrived at the recruiting office, it was closed. I went home and called the recruiting office. At that time, I was told there was not another position available and that my employment had, in fact, been terminated. I believe the transfer was a ruse to induce me to leave my position in PICU.

In his deposition testimony, Valderaz clarifies what he means in saying that his "employment was terminated." Although he didn't know it immediately after the April 11 meeting, his employment at the hospital was not terminated in whole. Rather, his employment *as a full-time nurse* ended, and he was transferred to "on-call" status at the hospital. When he was a full-time nurse, he had insurance and retirement benefits; as an on-call employee, he did not. As an on-call employee, he did not work full-time, but only as needed. If he wanted to return to his status as a full-time employee with benefits, he would have had to apply for an open position and be accepted, just as any outside applicant would, and he would not be guaranteed a position. Valderaz says that there was no discussion of his on-call status change during either the April 11 meeting or the subsequent conversation with the recruiting office. He states that during the April 11 meeting he was promised a transfer to an equivalent position as a full-time nurse, but that after the meeting he was told by the recruiting office that his position was terminated. He states that he was not aware until sometime

later that the hospital had not fired him in whole, but had reclassified him as an on-call nurse.[1]

In short, Valderaz's contention is that, in his meeting with HR to discuss his complaint of sex discrimination, the hospital, in direct response to his complaint, promised him a transfer to an equivalent job; then, for no stated reason, the hospital reneged on its promise.[2]  It did not transfer him to an equivalent job, but it reclassified him to continue working on an "as-needed" basis, without the full-time pay or benefits he formerly had, and told him that if he wanted full-time work again, he would have to apply for it and compete with all other applicants on an equal footing.

To support a *prima facie* claim of retaliation under Title VII, the plaintiff must show that "(i) he engaged in a protected activity, (ii) an adverse employment action occurred, and (iii) there was a causal link between the protected activity and the adverse employment action."  *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012).  In my view, those elements are met here.

First, there is no question that Valderaz's reports to hospital supervisors of what he believed to be sex discrimination was protected activity.  I agree with the majority on this point.  *See ante*, at 6-7.

Second, it is an uncontroversial conclusion that an adverse employment action occurred.  An adverse employment action is employer conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548

---

[1] The record contains a hospital form reflecting Valderaz's on-call status change on April 25, 2011.  Another hospital form in the record reflects the complete termination of Valderaz's employment on June 24, 2011.

[2] The hospital does not deny that Newton, its HR director, had authority to act on its behalf in personnel matters such as Valderaz's.

No. 14-10761

U.S. 53, 68 (2006) (internal quotation marks and citation omitted).  After Valderaz complained about sex discrimination, he lost his status, salary, and benefits as a full-time employee.  Such a loss of status, salary, and benefits would dissuade a reasonable worker from making a charge of discrimination.

Third, it is equally clear that Valderaz's deposition and affidavit testimony supports a causal link between his complaint of sex discrimination and the adverse employment action.  Valderaz testifies that the hospital made its false promise of a transfer, on which it later reneged, when meeting with him to discuss his discrimination complaint.  The false promise of a transfer and the corresponding diminishment of employment status, salary, and benefits, in other words, was the hospital's immediate and direct response to Valderaz's discrimination complaint.  If such an immediate and direct response to a discrimination complaint does not constitute a causal link, then nothing does.[3]

Because Valderaz's evidence suffices for a *prima facie* case of retaliation, the burden shifts to the hospital "to provide a legitimate, non-

---

[3] The majority finds causation present here because fewer than four months elapsed between when Valderaz first complained about sex discrimination to hospital supervisors (March 2, 2011) and when his employment was terminated (which the majority concludes was June 24, 2011, based on the hospital's documentary evidence). *Ante*, at 10-11.  This is a puzzling and unnecessary analysis.  There are some cases where the only evidence of a causal link between the employee's complaint of discrimination and some subsequent adverse employment action is the circumstantial fact that only a short period of time passed between the two events.  But this is not such a case.  Here, the employee and the employer had a conversation about the employee's claim that he was a victim of discrimination, and, *in that conversation and in direct response to the employee*, the employer committed part of the alleged adverse employment action—*i.e.*, the false promise of a transfer.  Causation is present because the hospital's conduct was unambiguously responsive, and directly so, to Valderaz's charge of discrimination.  *Cf., e.g.*, *Loveless v. John's Ford, Inc.*, 232 F. App'x 229, 234 (4th Cir. 2007) (unpublished) (rejecting employer's argument as to an "insufficient nexus" when employer made derogatory comments in direct response to the employee's question of "why me?"). There is therefore no need in this case to search for causation buried in circumstantial evidence.

No. 14-10761

retaliatory reason for the adverse employment action." *Hernandez*, 670 F.3d at 657 (internal quotation marks and citation omitted). The hospital has satisfied that burden. Simply stated, its witnesses dispute Valderaz's testimony about the April 11 meeting. Valderaz was never promised any other position, the hospital's witnesses maintain. According to them, Valderaz resigned from his full-time job of his own volition. There was simply no retaliation, the hospital contends, but only a voluntary resignation.

Now, the question is whether Valderaz's evidence creates a genuine dispute as to whether the hospital terminated his full-time employment against his will and as a result of his discrimination complaint. *See Hernandez*, 670 F.3d at 657. I think that it does. This case comes down to dueling testimony. Valderaz's testimony, corroborated by his wife's, is that the hospital, in direct response to his discrimination complaint, made a false promise to him that it did not keep and instead terminated his full-time employment, leaving him with lesser status, salary, and benefits. The hospital counters with testimony that no such thing happened. Therefore, it falls to the jury to listen to the witnesses, believe whom it will, and rule accordingly. *See Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005) (the court cannot make credibility determinations or weigh any evidence on a summary judgment motion). Valderaz is entitled to a trial, and we should therefore reverse the district court's summary judgment and remand for such.

## II.

Respectfully, the majority's stated reasons for denying Valderaz's retaliation claim, which I will now address, are erroneous.

18

No. 14-10761

**A.**

First, the majority states in a footnote that it disregards Valderaz's affidavit (and apparently his wife's corroborative affidavit, too) because the affidavit "contrasts with" Valderaz's prior deposition testimony. *Ante*, at 12 n.6. The majority explains:

> At his deposition, Valderaz acknowledges that his decision not to return to the PICU was *not* dependent upon any promise that he be transferred to another job with the hospital. Valderaz testified that the reason he did not go back was because of the perceived hostile work environment. That was his testimony, and his later filed affidavit should not be relied upon to defeat summary judgment.

*Id.* (emphasis in original). If Valderaz truly testified at his deposition that he chose to leave his job irrespective of any promise of a transfer to another position, then such testimony would indeed conflict (or at least be in tension) with the affidavit. However, as I read Valderaz's deposition, he did not so testify. The deposition testimony shows the majority's misunderstanding of it:

> Q.   Did you ever make a determination that you were not going back to work in the PICU?
>
> A.   I informed Mrs. Newton that the environment was so hostile and so inappropriate and not conducive to the care of critically ill pediatric patients that it was an unsafe environment for me to practice, that it would possibly cause an adverse effect or event to a pediatric patient which would then cause an adverse effect to my licensure and career and employment, that I was not receiving appropriate support for pediatric patients for the care and the requirements involved. That the most comfortable way for me to go back to work is to receive the tools, the equipment, the personnel,

19

the support and the education to effectively care for pediatric intensively ill children.

Q. Okay. But my question was, did you make a determination "I'm not going back there"?

A. Based on that criteria.

Q. And when did you make that determination?

A. With a meeting with Mrs. Newton.

Q. And I believe that was on April 11th . . . .

A. Yes, sir.

Q. . . . [T]hat determination was not based on having an alternative place to go, it was a determination made that "I'm not going back there under any circumstances," correct?

A. The determination was that it was an unsafe environment to practice nursing.

Q. And you made that determination you were not going back into that?

A. That unless the situation, that the unsafe situation was resolved, in an effective manner for me to practice in a safe environment, that is correct.

Q. Okay. So your decision on April 11th not to go back was not dependent upon any promise that you be transferred someplace else, it was based on your feeling that that was not a place that you could thrive and not a place you could be safe and not a place that you were going to take the risk of going back to, correct?

A. Unless the situation was—the hostile work environment situation was resolved.

Clearly, the hospital's attorney repeatedly attempted to elicit testimony from Valderaz that he wouldn't continue working in his department under any circumstances and that such decision was made irrespective of any

No. 14-10761

promise to transfer to another department, but Valderaz never gave such testimony. The majority's statement that Valderaz testified to leaving his department based entirely on perceived hostility and irrespective of any promise to transfer to another department is clear error. (Notably, the majority doesn't quote any actual deposition testimony to that effect. There is none.) Instead, Valderaz testified that he *would* continue working in his department *if* the hostile environment (what he perceived to be a hostile environment, that is) were resolved. And that testimony is entirely consistent with his affidavit attesting that he agreed to transfer to a different department based upon the hospital's promise that he would actually be given such a transfer. In fact, immediately after this part of the deposition, Valderaz proceeded to testify, consistent with the affidavit, that the hospital promised him a transfer during the April 11 meeting, *e.g.*:

> Q.    You allege that you were promised that you
>       would be transferred?
>
> A.    Absolutely.

There is, in short, no conflict between Valderaz's deposition testimony and his affidavit. Both the deposition and the affidavit tell the same story, *viz*.: Valderaz informed the hospital that he didn't want to continue working in his current department unless the environment in the department changed, the hospital responded by promising to transfer him to another department, and he agreed to the hospital's offer of a transfer, but then the hospital reneged on that offer, thus leaving him without a full-time job.

The rules of summary judgment require that we credit this evidence of Valderaz, the nonmovant, as the Supreme Court has recently reminded us. *Tolan v. Cotton*, 134 S. Ct. 1861 (2014) (per curiam), *summarily rev'g* 713 F.3d 299 (5th Cir. 2013). With due respect to the majority, its decision to

21

## No. 14-10761

construe Valderaz's deposition testimony against him, mistakenly perceiving a conflict where there is none, and using that erroneous construction as a basis for wholly excluding his affidavit—and apparently his wife's affidavit, also—from consideration is plain error.  The Supreme Court told us in *Tolan* that it intervened in that case because this court's opinion reflected "a clear misapprehension of summary judgment standards."  *Id*. at 1868.  It is unfortunate that the same can be said here.

### B.

Second, there is no evidence, the majority says, that Valderaz "was terminated immediately after the April 11 meeting."  *Ante*, at 11-12.  According to the majority, the evidence "irrefutably" shows that he was terminated later, "weeks after having been placed as an on-call status employee."  *Id*. at 12.  Respectfully, the majority misconstrues Valderaz's claim and the relevant evidence.  When Valderaz says that his employment was "terminated" after the April 11 meeting, what he means is that his *status as a full-time employee* was terminated after the meeting. *See* Valderaz's Br., at 14 ("Valderaz was tricked into terminating *his full time employment* by being told by [hospital] representatives that he was not resigning his job but was, instead, simply transferring to a new department.") (emphasis added).[4]

---

[4] See also the following excerpt from Valderaz's deposition:

> Q.    Was there any discussion [during the April 11 meeting] about you remaining on call . . . ?
>
> A.    No, there was no discussion.  I actually found that out after the fact, and I was then terminated a second time for not–
>
> Q.    You got terminated twice?  You got terminated even after you had been terminated?
>
> A.    I was terminated from UMC [University Medical Center hospital] a [*sic*] full-time position.  And I did not know–that had benefits and had retirement and had insurance.  And then I was

No. 14-10761

And there is no dispute—the parties agree—that Valderaz's full-time employment ended after the April 11 meeting. The only dispute is whether it ended as a result of Valderaz's voluntary choice (as the hospital claims) or not (as Valderaz claims). In short, Valderaz's full-time employment ended after the April 11 meeting, and his retaliation claim focuses on that undisputed fact. The majority has ignored Valderaz's actual claim and instead denied another claim that is not asserted.

## C.

Third, the majority discusses Valderaz's attempts to find another job at the hospital and his "lack of diligence" in doing so. *Ante*, at 12. Here, the majority entirely misses the point. As I explained, Valderaz's claim of retaliation focuses on the loss of his status, salary, and benefits as a full-time employee. His efforts toward finding another job *after* he lost full-time employment are irrelevant.

* * *

In sum, the majority presents no valid reason for denying Valderaz his day in court. Properly understood, his claim of retaliation is supported by sufficient evidence, and he has the right to have a jury assess it. I respectfully dissent from the majority's denial of that right.

---

then told that I had a [part-time] position that had no benefits, had no secure employment, was just an as-needed position that–that was still there. And I had no idea, nobody had told me.

This exchange makes clear that in Valderaz's terminology, there were two so-called "terminations." The first "termination"—the one that is the focus of this case—was during and after the April 11 meeting, when he was switched from full-time work to on-call status. The second "termination" was weeks later when he was no longer employed by the hospital in any manner.

23